IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHERMAN PERRY,                    :
                                  :
          Plaintiff,              :
                                  :
     v.                           : Civil Action No. 06-112-JJF
                                  :
                                  :
MICHAEL J. ASTRUE[1],             :
Commissioner of Social            :
Security,                         :
                                  :
          Defendant.              :

---

Laura Forsythe Browning, Esquire of GRADY & HAMPTON, L.L.C., Dover, Delaware.

Attorney for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware. Donna L. Calvert, Esquire, Regional Chief Counsel, and Maija Pelly, Esquire, Assistant Regional Counsel, of the SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania. David F. Chermol, Esquire, Special Assistant United States Attorney of the OFFICE OF THE UNITED STATES ATTORNEY, Philadelphia, Pennsylvania.

Attorneys for Defendant.

---

### MEMORANDUM OPINION

September 27, 2007
Wilmington, Delaware

---

[1]    On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the former Commissioner JoAnne B. Barnhart.

Farnan, District Judge.

Presently before the Court is an appeal pursuant to 42
U.S.C. §§ 405(g) filed by Plaintiff, Sherman Perry, seeking
review of the final decision of the Commissioner of the Social
Security Administration denying Plaintiff's application for
disability insurance benefits ("DIB") and supplemental security
income ("SSI") under Title II and XVI of the Social Security Act
(the "Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  Plaintiff has
filed a Motion For Summary Judgment (D.I. 15) requesting the
Court to enter judgment in his favor or remand this matter to the
Commissioner.  In response to Plaintiff's Motion, Defendant has
filed a Cross-Motion For Summary Judgment (D.I. 20) requesting
the Court to affirm the Commissioner's decision.  For the reasons
set forth below, Defendant's Motion For Summary Judgment will be
granted, and Plaintiff's Motion For Summary Judgment will be
denied.  The decision of the Commissioner dated November 4, 2005,
will be affirmed.

## BACKGROUND

## I.  Procedural Background

Plaintiff protectively filed an application for DIB and SSI
on March 12, 2004, alleging disability since January 1, 2002, as
a result of bad balance, joint pain and high blood pressure.
(Tr. 155-157, 163.)  Plaintiff's application was denied initially
and upon reconsideration.  (Id. at 134-139, 143-148.)  Plaintiff

1

timely requested a hearing before the A.L.J., and a hearing was held on May 25, 2005.  (Id. at 48-133, 149.)

At the hearing, Plaintiff appeared with counsel and testified on his own behalf.  A vocational expert also testified. On June 22, 2005, the A.L.J. held a supplemental hearing during which Plaintiff's mother and sister testified.

On November 4, 2005, the A.L.J. issued a partially favorable decision finding that Plaintiff was disabled as of February 15, 2005.  (Id. at 11-26.)  However, the A.L.J. determined that Plaintiff did not establish disability prior to March 31, 2004, his date last insured, and therefore, Plaintiff became eligible to receive only SSI and not DIB.  Thereafter, Plaintiff requested review by the Appeals Council, and his attorney submitted a brief on his behalf.  (Id. at 10, 349-361.)  After considering the additional submission from Plaintiff's counsel along with the record evidence, the Appeals Council denied review.  (Id. at 5-9).  Accordingly, the A.L.J.'s decision became the final decision of the Commissioner.  Sims v. Apfel, 530 U.S. 103, 107 (2000).

After completing the process of administrative review, Plaintiff filed the instant civil action pursuant to 42 U.S.C. § 405(g), seeking review of the A.L.J.'s decision denying his claim for DIB and SSI.  In response to the Complaint, Defendant filed an Answer (D.I. 11) and the Transcript (D.I. 13) of the proceedings at the administrative level.

Thereafter, Plaintiff filed a Motion For Summary Judgment and Opening Brief (D.I. 15, 16) in support of the Motion.  In response, Defendant filed a Cross-Motion For Summary Judgment and a combined Opening and Answering Brief (D.I. 20, 21) requesting the Court to affirm the A.L.J.'s decision.  Plaintiff filed a Reply Brief (D.I. 22), and therefore, this matter is fully briefed and ripe for the Court's review.

## II.  **Factual Background**

### A.   Plaintiff's Medical History, Condition and Treatment

At the time the A.L.J. issued his decision, Plaintiff was forty-four years old. (Tr. 15).  Plaintiff completed eleventh grade and has past relevant work as a correctional officer, construction worker, and dishwasher. (Id. at 169, 213-214.) According to the vocational expert, these jobs are classified as unskilled to semi-skilled and light to heavy in exertion. (Id. at 126.)

#### 1.   Physical Condition

The earliest medical evidence in the record comes from Plaintiff's March 2, 2004 visit with Jerome E. Groll, M.D. Plaintiff reported a history of hypertension, chronic pain since the 1990s, balance problems, and chronic numbness in his left arm.  Plaintiff also reported that he had not worked since 1997. Upon examination, Dr. Groll noted that Plaintiff had full range of motion in all of his joints with no pain, crepitance,

3

tenderness, swelling or warmth, and no muscular atrophy, weakness or tenderness.  Plaintiff was unable to stand on one leg for more than 2 seconds, but was able to heel and toe walk.  Plaintiff had full flexion of his back, 4/5 strength in this legs and good strength in all of his extremities.  Dr. Groll diagnosed Plaintiff with hypertension and incoordination and prescribed medication.

On June 10, 2004, Plaintiff reported for a neurological consultation with Michael H. Mark, M.D. at the request of the Department of Disability Determination Services.  (Id. at 235-241.)  Plaintiff reported to Dr. Mark that he had "a sudden onset of balance problems beginning in 1996 without evidence of injury." (Id. at 235.)  Plaintiff reported that his problems were stable since that time.  Although Plaintiff did not describe actual falls, he reported that he falls to the left and he described some weakness in his left leg.  Plaintiff also reported that he experiences lightheadedness once a week and that it improves if he sits down for twenty minutes.  Plaintiff also complained of numbness in his left forearm and hand with a tingling sensation.  However, Plaintiff indicated that these symptoms did not affect the use of his hand.

Dr. Mark noted that Plaintiff's mental status and cranial nerves were both normal.  A motor examination revealed normal power and normal deep tendon reflexes.  Plaintiff had no limb

4

ataxia and his gait did not show objective loss.  Dr. Mark noted

that Plaintiff could walk moving in a tendon gait manner.  A

sensory examination "revealed a subjective decrease to pain and

temperature in the left C7-C8 distribution of the arm and a vague

ill-defined loss in the leg."  (Id. at 236.)  Plaintiff was also

able to stand with his feet together and eyes closed.

Dr. Mark opined that Plaintiff might have some mild sensory

loss in the C6-C7 distribution, but that his neurological

examination was essentially normal.  Dr. Mark also noted some

evidence of mild C7-C8 and T1 wound irritation, but no functional

radiculopathy.  There were no objective deficits involving the

left leg with his balance system and "no objective findings to

support the symptoms of chronic ataxia and falling to the left."

(Id.)  Dr. Mark noted no other symptoms of leg weakness.  Dr.

Mark recommended further testing, including x-rays and MRIs.

On August 3, 2004, Plaintiff's medical records were reviewed

by Michael Borek, M.D., a state agency physician.  Dr. Borek

opined that Plaintiff did not have a severe physical impairment.

(Id. at 254-264.)

On August 17, 2004, Plaintiff returned to Dr. Groll's office

and was examined by Byrna Groll, FNP-C.  Plaintiff complained of

a cough and requested Motrin for his knee pain.  Family Nurse

Practitioner Groll noted that Plaintiff had a coordinated and

smooth gait; full range of motion in all joints with no pain,

crepitance, tenderness, swelling or warmth; no muscular atrophy or weakness; good grip strength bilaterally; and no muscular tenderness.

On August 30, 2004, Plaintiff was again seen by Dr. Groll. Plaintiff complained of knee pain, hand pain and joint pain. Upon examination, Dr. Groll noted that Plaintiff had a smooth and coordinated gait, no muscular tenderness, and intact cranial nerves. (Id. at 229.)  Dr. Groll diagnosed Plaintiff with incoordination and numbness and referred him to a neurologist. (Id. at 230.)

On October 26, 2004, Plaintiff met with a neurologist, William A. Thomas, Jr., M.D.  Plaintiff reported a ten year history of numbness and tingling in his left forearm and hand. Plaintiff also complained of a chronic dull aching type headache involving his entire head, but more localized to the left scalp. Dr. Thomas examined Plaintiff and reported his neurological status as normal.  Dr. Thomas noted that Plaintiff had 5/5 motor strength in all areas and +2 symmetrical reflexes.  Plaintiff's sensory examination was intact, except for diminished sensation over the dorsum of the left forearm.  He also had moderately impaired light touch, position and vibration in the distal lower extremities.  Plaintiff had intact cerebellar functioning for finger-to-nose and heel-to-shin testing.  Dr. Thomas also reported that Plaintiff had a normal based gait with no evidence

of ataxia, stooped posture or shuffling.  (Id. at 287.)  Dr.
Thomas diagnosed Plaintiff with left forearm paresthesia and
sensory deficit, left forearm and hand pain and paresthesia,
lower extremity peripheral polyneuropathy, episodic headache pain
and hypertension.  He also recommended that Plaintiff undergo an
MRI of the brain and an electromyography of the upper
extremities.

On November 2, 2004, Plaintiff underwent an MRI of his
brain.  The reviewing physician found no evidence of mass lesion,
hemorrhage, hydrocephalus, an evolving major vascular territory
CVA, or evidence for pathological contrast enhancement.  (Id. at
338.)  However, the MRI did reveal signal abnormalities which
were most consistent with a primary demyelinating process,
although the absence of pathological contrast enhancement
suggested the absence of active demyelination.  The reviewing
physician noted that alternative processes such as sarcoidosis,
Lyme disease and vasculitis should be considered.  He also noted
that the temporal lobe abnormality may provide an explanation for
Plaintiff's seizures.

On November 15, 2004 Plaintiff underwent an
electromyography.  The study revealed mild median mononeuropathy
in the distal segment across the wrist.  These findings were
consistent with carpal tunnel syndrome and clinical correlation
was recommended.

On November 22, 2004, Plaintiff also underwent electrodiagnostic studies which revealed right peroneal mononeuropathy and mild bilateral multi-level lumbosacral spine disease. (Id. at 324.)  An MRI of the lumbar spine and blood work was recommended.

On November 23, 2004, Dr. Thomas noted that Plaintiff's MRI revealed bilateral paraventricular white matter lesions which might be related to multiple sclerosis, multiple crebrovascular ischemic events and vasculitis; left upper extremity pain and paresthesia, right carpal tunnel syndrome, hypertension and chronic headache pain.  Dr. Thomas recommended a repeat MRI of the brain in six months and a possible cerebrospinal fluid examination.

On December 2, 2004, Plaintiff underwent an MRI of the lumbar spine which revealed no evidence of spondylolisthesis, significant disc herniation, canal stenosis or significant neural foraminal narrowing.  However, the MRI did reveal barely perceptible evidence of early arthritic changes involving the lumbar spine.  (Id. at 340.)

On December 15, 2004, Dr. Thomas found that Plaintiff's MRI was consistent with potential demyelinating disease.  Plaintiff's physical examination was unchanged.  Dr. Thomas recommended a lumbar puncture and prescribed aspirin.

8

On January 12, 2005, Plaintiff treated with Dr. Groll for a skin irritation and a follow-up to his high blood pressure. Plaintiff reported balance problems.  Dr. Groll noted no abnormal musculoskeletal or neurological findings, but observed some hyperpigmentation of the skin.  (Id. at 325.)

On January 27, 2005, Plaintiff underwent the lumbar puncture.  He treated with Dr. Groll again on February 1, 2005, and complained of a cough and erectile dysfunction.  Plaintiff presented no complaints about balance or numbness.

On February 15, 2005, Dr. Thomas diagnosed Plaintiff with multiple sclerosis based on his MRI and cerebrospinal fluid studies.  He prescribed medication and requested a follow-up visit.  Plaintiff also requested a disability determination, which Dr. Thomas noted in his recommendations.

On March 15, 2005, Dr. Groll completed a Physician's Statement at the request of Plaintiff's attorney.  Dr. Groll reported that he treated Plaintiff since the 1980s.  He noted Plaintiff's diagnosis for multiple sclerosis and high blood pressure.  He noted that Plaintiff had complained of joint pain, balance problems and extreme fatigue.  Dr. Groll opined that Plaintiff was unable to work on a full-time basis since prior to March 2, 2004.  (Id. at 333.)

On June 10, 2005, Dr. Thomas also completed a Physician's Statement at the request of Plaintiff's attorney.  Dr. Thomas

9

reported that he treated Plaintiff since October 26, 2004, and
diagnosed him with MS.  Dr. Thomas indicated that Plaintiff
complained of joint pain, trouble speaking, a history of losing
his balance, frequent falls and extreme fatigue.  Dr. Thomas
opined that Plaintiff could not work on a full-time basis, but
indicated that part-time work would not exacerbate his condition.
(Id. at 345.)  Dr. Thomas also opined that Plaintiff was unable
to work from prior to October 26, 2004.

        2.   Mental condition

    On June 16, 2004, Plaintiff attended an evaluation with
Frederick Kozma, Jr., Ph.D., a clinical psychologist, at the
request of DDS.  Plaintiff stated that he "got sick" in 1986 and
his balance was "messed up" since then.  Plaintiff complained of
numbness on his left side, difficulty standing for long periods
of time and a stiff and awkward gait.  Plaintiff stated that
these conditions made him unable to keep a job.

    Upon examination, Dr. Kozma observed that Plaintiff's body
movements were very slow and his gait was stiff and awkward.
Plaintiff's insight and judgment were evaluated as fair to poor.
His speech was coherent and relevant, but he offered information
in a disorganized manner.  He was cooperative and oriented in all
three spheres.  Plaintiff's mood was mildly depressed, and Dr.
Kozma noted that he seemed discouraged by his difficulties in
moving comfortably and holding a job.

Plaintiff's full scale, verbal and performance IQ scores were within the Extremely Low to Borderline range of intellectual functioning.  Dr. Kozma diagnosed Plaintiff with mild mental retardation on Axis II, high blood pressure and balance problems on Axis III, and unemployment and financial problems on Axis IV.  His Global Assessment of Functioning ("GAF") score was rated at 60.  Dr. Kozma opined that Plaintiff was limited in employment due to his physical difficulties and his cognitive limitations played a secondary role.  (Id. at 247).

Dr. Kozma also completed a Psychological Functional Capacities Evaluation Form.  On this form, Dr. Kozma reported that Plaintiff had a mild degree of impairment with respect to his ability to relate to other people, a deterioration of personal habits and his ability to carry out instructions under ordinary supervision.  Dr. Kozma also reported that Plaintiff had a moderate degree of impairment with respect to the restriction of daily activities and his ability to perform routine, repetitive tasks under ordinary supervision.  Dr. Kozma reported that Plaintiff was under a moderately severe degree of impairment with respect to his ability to sustain work performance and attendance in a normal work setting and to cope with the ordinary pressures of work.  Plaintiff also had a severe constriction of interests.  (Id. at 253.)

On August 12, 2004, Plaintiff's records were reviewed by
Doug Fugate, Ph.D., a state agency psychologist.  Dr. Fugate
concluded that Plaintiff's mental impairments mildly limited his
ability to perform daily activities and maintain social
functioning; moderately limited his ability to maintain
concentration, persistence or pace and resulted in no episodes of
decompensation.  (Id. at 269-282.)

Dr. Fugate also completed a Mental Residual Functional
Capacity Assessment in which he concluded that Plaintiff was
"markedly limited" in his ability to understand, remember and
carry out detailed instructions and "moderately limited in his
ability to maintain attention or concentration for extended
periods, complete a normal workday and work week without
interruptions from psychologically based symptoms, perform at a
consistent pace without an unreasonable number and length of rest
periods and respond appropriately to changes in the work setting.
Dr. Fugate also determined that Plaintiff was not significantly
limited in fifteen other areas, including among others, his
ability to remember locations and work like procedures,
understand, remember and carry out simple instructions, perform
within a regular schedule and maintain regular attendance, and
sustain an ordinary routine without supervision.

On November 23, 2004, a second stage agency physician,
Carlene Tucker-Okine, Ph.D., reviewed Plaintiff's records and

determined that Plaintiff had a mild mental impairments which mildly affected his ability to perform daily activities and maintain social functioning.  Dr. Tucker-Okine also found that Plaintiff was moderately limited in his ability to maintain concentration, persistence and pace and that he had no episodes of decompensation.  (Id. at 304-317.)

Dr. Tucker-Okine also completed a Mental Residual Functional Capacity Assessment in which she found that Plaintiff suffered from no "marked" limitations and was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for an extended period of time, to perform activities within a regular schedule, and to complete a normal work day and work week without interruption from psychological based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Id. at 318-319.)  In all other areas of assessment, Dr. Tucker-Okine found that Plaintiff was not significantly limited.

Dr. Tucker-Okine also provided a narrative statement in which she explained that Plaintiff's low cognitive functioning did not meet the criteria for mental retardation in light of his adaptive skills, the fact that he was not in special education and the fact that he had no history of cognitive problems.  Dr. Tucker-Okine also opined that Plaintiff could perform simple

13

tasks.  (Id. at 320.)

B.   The A.L.J.'s Decision

On May 25, 2004, the A.L.J. conducted a hearing on
Plaintiff's application for benefits.  At the hearing, the A.L.J.
asked the vocational expert whether jobs existed for a
hypothetical individual of Plaintiff's age, education and
vocational profile, if he retained the residual functional
capacity to lift twenty pounds occasionally and ten pounds
frequently, stand and walk for up to 2 hours in an 8-hour work
day, sit for six hour in an 8-hour work day, with no climbing
ladders, ropes or scaffolding, avoiding exposure to heights and
hazards and limited to simple, unskilled, low stress work needing
only occassional changes in the work setting or need for
decision-making.  The vocational expert identified several jobs
such a hypothetical individual could perform.  Specifically, the
vocational expert identified 1,300 positions regionally and
572,000 nationally for an addressor; 6,125 positions regionally
and 318,250 nationally for a call out operator; and 3,200
positions regionally and 324,000 nationally for a surveillance
systems monitor.  (Id. 127-128.)

In his decision dated November 4, 2005, the A.L.J. found
that Plaintiff suffered from multiple sclerosis and depression,
but that his impairments did not meet or equal one of the listed
impairments in 20 C.F.R. pt. 404, subpt. P. app. 1.  (Id. at 19).

14

The A.L.J. also found that Plaintiff's history of high blood pressure, back pain and headaches were not severe impairments. The A.L.J. found that Plaintiff's allegations regarding his limitations were not totally credible prior to February 2005, but that they were generally credible thereafter.  The A.L.J. concluded that prior to February 2005, Plaintiff had the RFC to perform unskilled, sedentary work and that a significant number of these jobs existed in the national economy.  Thus, the A.L.J. concluded that Plaintiff was not disabled any time prior to February 15, 2005.  However, the A.L.J. concluded that Plaintiff had become disabled as of February 15, 2005, but Plaintiff was not entitled to DIB, because his disability was not established as of the date of his last insured status, which was March 31, 2004.

## STANDARD OF REVIEW

Findings of fact made by the Commissioner of Social Security are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision.  Monsour Medical Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).  In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.  Id.  In other words, even if the reviewing court would have decided the

15

case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence.  Id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence.  As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 555 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed that "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).  Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. Id.; Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

## DISCUSSION

### I.   Evaluation Of Disability Claims

Within the meaning of social security law, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3).  To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy."  20 C.F.R. § 404.1505.  In order to qualify for disability insurance benefits, the claimant must establish that he or she was disabled prior to the date he or she was last insured.  20 C.F.R. § 404.131, Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).  The claimant bears the initial burden of proving disability.  20 C.F.R. §§ 404.1512(a); Podeworthy v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations require the A.L.J. to perform a sequential five-step analysis. 20 C.F.R. §§ 404.1520.  In step one, the A.L.J. must determine whether the claimant is currently engaged in substantial gainful activity.  In step two, the A.L.J. must determine whether the

17

claimant is suffering from a severe impairment.  If the claimant
fails to show that his or her impairment is severe, he or she is
ineligible for benefits.  Plummer v. Apfel, 186 F.3d 422, 427 (3d
Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds
to step three.  In step three, the A.L.J. must compare the
medical evidence of the claimant's impairment with a list of
impairments presumed severe enough to preclude any substantial
gainful work.  Id. at 428.  If the claimant's impairment meets or
equals a listed impairment, the claimant is considered disabled.
If the claimant's impairment does not meet or equal a listed
impairment, the A.L.J.'s analysis proceeds to steps four and
five.  Id.

In step four, the A.L.J. is required to consider whether the
claimant retains the residual functional capacity to perform his
or her past relevant work.  Id.  The claimant bears the burden of
establishing that he or she cannot return to his or her past
relevant work.  Id.

In step five, the A.L.J. must consider whether the claimant
is capable of performing any other available work in the national
economy.  At this stage the burden of production shifts to the
Commissioner, who must show that the claimant is capable of
performing other work if the claimant's disability claim is to be
denied.  Id.  Specifically, the A.L.J. must find that there are

other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity.  Id.  In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments.  At this step, the A.L.J. often seeks the assistance of a vocational expert.  Id. at 428.

## II.   Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By his Motion, Plaintiff contends that the A.L.J. improperly concluded that Plaintiff's disability onset date was February 15, 2005.  Plaintiff contends that the A.L.J. failed to apply SSR 83-20, because he did not seek a medical advisor, failed to acknowledge the claimant's testimony, failed to acknowledge third party observations regarding his balance and walking, and failed to properly use his treating physician's statements that he was unable to work prior to October 26, 2004 and March 2, 2004.

The onset date of disability is "the first day an individual is disabled as defined in the Act and the Regulations."  SSR 83-20.  In determining an onset date, the A.L.J. must consider:  (1) the claimant's allegations as to the onset date; (2) the date the claimant left work; and (3) the medical evidence of onset.  Of these three factors, the "medical evidence serves as the primary element in the onset determination."  SSR 83-20.

19

Plaintiff was last insured as of March 31, 2004.  The
earliest medical evidence in the record is Plaintiff's March 2,
2004 visit to Dr. Groll.  Although Plaintiff reported a history
of hypertension, chronic pain since the 1990s, balance problems
and chronic numbness in his left arm, Dr. Groll's examination
revealed that Plaintiff had full range of motion in all his
joints with no pain, crepitance, tenderness, swelling or warmth,
and no muscular atrophy, weakness or tenderness.  Dr. Groll
reported that Plaintiff's cranial nerves were intact, he had
present and symmetric deep tendon reflexes and good strength in
his arms and legs.  In short, Dr. Groll's examination did not
reveal any evidence that Plaintiff was disabled as of March 2004.

Plaintiff contends that the A.L.J. erred in failing to
credit the opinions of his treating physicians.  Specifically, in
March 2005, Dr. Groll completed a Physician's Statement opining
that Plaintiff was disabled as of March 2, 2004.  A second
physician, Dr. Thomas, completed a Physician's Statement in June
2005, opining that Plaintiff was unable to work as of October 24,
2004.

Although a treating physician's opinion is entitled to great
weight, a treating physician's statement that a plaintiff is
unable to work or is disabled is not dispositive.  The A.L.J.
must review all the evidence and may discount the opinions of
treating physicians if they are not supported by the medical

20

evidence, provided that the A.L.J. explain his or her reasons for rejecting the opinions adequately.  Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001), Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).  In this case, the A.L.J. declined to credit the opinions of Plaintiff's treating physicians on the basis that the medical evidence from the relevant time frame did not support the opinions that were rendered and neither physician provided any documentation to substantiate their opinions.  Indeed, Dr. Groll, who had examined Plaintiff on March 2, 2004, found no evidence at that time that Plaintiff was unable to work.  Similarly, Dr. Thomas, who had examined Plaintiff on October 24, 2004, found no evidence that Plaintiff was unable to work and reported that Plaintiff had a normal neurological examination, 5/5 motor strength, +2 symmetrical reflexes, and a normal gait with no evidence of ataxia, stooped posture or shuffling.  Accordingly, the Court cannot conclude that the A.L.J. erred in declining to credit the date of disability onset indicated by Plaintiff's treating physicians in their Physician's Statements.

Plaintiff also contends that the A.L.J. erred in failing to credit his testimony concerning his condition and the date of onset, as well as the observations of third parties regarding Plaintiff's condition.  SSR 83-20 provides that "the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of

21

the condition(s) shown by the medical evidence." As the Court
has explained, the medical evidence from the relevant time frame
is inconsistent with Plaintiff's testimony, and therefore, the
Court cannot conclude that the A.L.J. erred in declining to give
more credit and/or weight to the allegations of Plaintiff and
other third parties.

Plaintiff also contends that the A.L.J. erred in failing to
consult a medical advisor in the context of this case as required
by SSR 83-20. According to SSR 83-20, the A.L.J. should consult
a medical advisor if he or she must infer the onset date of an
impairment that is not clear from the applicant's medical
records. In this case, however, adequate medical evidence exists
in the record demonstrating that Plaintiff's disability onset
date was after March 31, 2004. In addition to the unremarkable
findings of Dr. Groll in March 2004, and Dr. Thomas in October
2004, a consultative examiner, Dr. Mark, noted in June 2004, that
Plaintiff's neurological examination was essentially normal
except for some mild sensory loss in the C6-c7 distribution, and
that Plaintiff had no objective deficits in his left leg with
regard to balance, no objective symptoms of chronic ataxia and
falling to the left, and no other symptoms of leg weakness. In
addition, an MRI of Plaintiff's brain in November 2004 showed
only a possible demyelinating process, but no active
demyelination, and Plaintiff's examination by Dr. Thomas in

22

December 2004 was essentially unchanged.  Similarly, Plaintiff reported to Dr. Groll twice in January 2005, and Dr. Groll noted no abnormal musculoskeletal or neurological findings.  Because there was adequate medical evidence in the record for the A.L.J. to determine that Plaintiff's onset date was not prior to his date last insured, the Court concludes that the A.L.J. did not err in declining to consult a medical advisor.

In sum, the Court cannot conclude that the A.L.J.'s decision was erroneous.  Substantial evidence supports the A.L.J.'s conclusion that Plaintiff's condition was not disabling prior to February 15, 2005, and certainly not disabling as of March 31, 2004, his date last insured.  Accordingly, the Court will affirm the November 4, 2005 decision of the A.L.J.

### CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment and deny Plaintiff's Motion For Summary Judgment.  The decision of the Commissioner dated November 4, 2005 will be affirmed.

An appropriate Order will be entered.